UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SEAN REDCLIFT, | ) | CIVIL ACTION NO. 4:21-CV-1866 |
| *Individually and as ADMINISTRATOR* | ) | |
| *of the Estate of Stacy Redclift,* | ) | |
| Plaintiff | ) | |
| v. | ) | (ARBUCKLE, M.J.) |
| | ) | |
| SCHUYLKILL COUNTY *,et. al.* | ) | |
| Defendants | ) | |

MEMORANDUM OPINION
*Coaldale Borough Defendants' Motion to Dismiss (Doc. 27)*

I.   INTRODUCTION

Tragically, Stacy Redclift took her own life when she was detained at the Schuykill County Prison. Her family now brings this civil rights action against a variety of actors, from the police officers who arrested her to prison guards, alleging they displayed deliberate indifference to her known risk of suicide. A transporting police officer and his employers have now moved to dismiss the claims against them. For the reasons that follow, I will grant their Motion in part and deny the Motion in part.

II.   BACKGROUND AND PROCEDURAL HISTORY

This case began on November 2, 2021, when Sean Redclift ("Plaintiff" or Sean),[1] acting individually and as the administrator of Stacy Redclift's estate, filed

---

[1] At times, for simplicity, I will refer to members of the Redclift family by their first names, without intending any disrespect or undue familiarity.

a Complaint. (Doc. 1). On January 6, 2022, Plaintiff amended his complaint as of right, and that is now the operative pleading. (Doc. 21).

As we are in the motion to dismiss stage, I will take all facts presented in the Amended Complaint as true. *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). In the early morning of January 6, 2020, Stacy Redclift was involved in a domestic dispute with her husband, Sean, and her son, Alexander. (Doc. 1, ¶ 45). Coledale Borough Police Officer Matthew Jungbaer and Coledale Borough Police Officers John Doe 1 and John Doe 2 arrived at her residence, and arrested Stacy "due to her allegedly erratic and non-compliant behavior." (*Id.* at ¶ 46). Stacy was later arraigned and released to her mother's house. (*Id.* at ¶ 47).

However, instead of staying at her mother's house, Stacy returned to her home, and engaged in erratic and non-compliant behavior. (*Id.* at ¶ 48). Officer Jungbaer, and the two John Doe police officers responded to the Redclift home and arrested Stacy. (*Id.* at ¶ 49). The officers brought Stacy to the Schuykill County Prison (the "Prison"). (*Id.*). However, before she arrived, Sean and Alexander told the officers that Stacy "had a history of mental illness, psychotic episodes, suicide attempts/ tendencies, and psychiatric hospitalizations." (*Id.* at ¶ 50).

Despite this knowledge, the officers, *inter alia*: (1) did not further probe into Stacy's state of mind to assess whether she needed medical care, or whether she was at risk for suicide; (2) did not communicate or inform any relevant person at the

Prison or PrimeCare of Stacy's mental health history;[2] (3) failed to ensure that safety measures to prevent suicide be done; and (4) were deliberately indifferent to her suicide risk. (*Id.* at ¶¶ 51-53). Additionally, Sean contends that the officers failed to: follow procedures designed to assess arrestees with mental illness and suicide risk; follow procedures to ensure the Prison and PrimeCare were aware of an arrestee's mental illnesses and suicide risks; and failed to ensure Stacy was either in an adequate mental institution, or on suicide watch. (*Id.* at ¶ 53). Finally, Plaintiff contends that Coledale Borough and the Coledale Police Department failed to train their officers and/or lacked a policy on, *inter alia*, assessing arrestees with mental health needs and making prison officials aware of an arrestee/inmate's mental health needs or suicide risk. (*Id.* at ¶¶ 99-112).

On the second day of her detention, January 7, 2020, Stacy's cellmate found Stacy hanging by a noose. (*Id.* at ¶ 71). Stacy Redclift died the next day. (*Id.* at ¶ 74).

Because of the aforementioned actions, Plaintiff asserts four counts against Officer Jungbaer, the two John Doe Coledale Police Officers, Coledale Borough Police Department, and Coledale Borough. The first is a 42 U.S.C. § 1983, Fourteenth Amendment, deliberate indifference claim against Officer Jungbaer, and

---

[2] PrimeCare is the medical contractor for the Schuykill County Prison and provides "comprehensive medical and nursing services" for the Prison. (*Id.* at ¶ 10).

John Does 1 and 2. The second claim is a 42 U.S.C. § 1983, Fourteenth Amendment, deliberate indifference *Monell* claim against the Coledale Borough Police Department and Coledale Borough. The third claim is a state law wrongful death claim, and the fourth claim is a state law survival action. In exchange for these alleged wrongs, Plaintiff seeks compensatory and punitive damages, attorney's fees, costs, and whatever relief the court deems appropriate. (*Id.* at ¶ 98, 112, 209, 213).

On January 19, 2022, Coledale Borough, Coaldale Borough Police Department, and Officer Matthew Jungbaer (collectively, "Moving Defendants") moved to dismiss them from this case for failing to state to claim upon which relief can be granted. (Doc. 27). Their Brief in Support was filed on February 2, 2022. (Doc. 48). Plaintiff filed a Brief in Opposition on February 16, 2022. (Doc. 63). Moving Defendants filed a Reply Brief on March 2, 2022. (Doc. 68). Thus, this Motion is ripe for resolution.

III.    THE MOTION TO DISMISS STANDARD

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss, the court "must accept all factual allegations in the complaint as true, construe the complaint in the light most favorable to the plaintiff, and ultimately determine

whether Plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). In review of a motion to dismiss, a court must "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

In deciding whether a complaint fails to state a claim upon which relief can be granted, the court is required to accept as true all factual allegations in the complaint as well as all reasonable inferences that can be drawn from the complaint. *Jordan v. Fox Rothchild, O'Brien & Frankel, Inc.*, 20 F.3d 1250, 1261 (3d Cir. 1994). These allegations and inferences are to be construed in the light most favorable to the plaintiff. *Id.* The court, however, "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). Further, it is not proper to "assume that the [plaintiff] can prove facts that [he] has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

"A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. *Id.* To

determine the sufficiency of a complaint under the pleading regime established by the Supreme Court, the court must engage in a three-step analysis:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where they are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Santiago v. Warminister Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 675, 679). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief" and instead must "'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

As the Court of Appeals has observed:

> The Supreme Court in *Twombly* set forth the "plausibility" standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint which pleads facts "merely consistent with" a defendant's liability, "stops short of the line between possibility and plausibility of 'entitlement of relief.'" *Id.* (citing *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

*Burtch v. Millberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011).

IV.    DISCUSSION

Moving Defendants put forth seven arguments to support their Motion. I'll discuss each in turn.

A.    WHETHER CUSTODY IS DISPOSITIVE OF PLAINTIFF'S CLAIMS

In summary, Moving Defendants argue that they were not Stacy's custodians at the time of her suicide, and thus cannot be responsible for it. (Doc. 48, pp. 5-7). Plaintiff counters by arguing that "any custodial officer at any point during the 'chain of custody'" can be held liable to a deliberate indifference to medical care/suicide risk claim. (Doc. 63, pp. 10-14). On this point, I agree with Plaintiff.

The Eighth Amendment protects prisoners from the infliction of cruel and unusual punishment. U.S. CONST. amend. VIII. To prevail on any Eighth Amendment claim, an inmate must show: (1) a deprivation that is objectively, "sufficiently serious;" and (2) "a sufficiently culpable state of mind" of the defendant official. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Beyond this general standard, there are different types of Eighth Amendment claims, and different criteria apply depending upon the type of violation alleged. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

When a plaintiff seeks to hold prison officials or medical staff accountable for failing to prevent a prison suicide, the "vulnerability to suicide" framework applies. This framework "is simply a more specific application of the general rule set forth

in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) which requires that prison officials not be deliberately indifferent to the serious medical needs of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017). "In essence, a 'particular vulnerability to suicide' is just one type of 'serious medical need.'" *Id.* (*citing Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1024 (3d Cir. 1991)). To plead a claim under this framework, a plaintiff must allege:

> (1) the prisoner had a particular vulnerability to suicide, (2) the prison official knew of that vulnerability, and (3) the prison official acted with deliberate indifference to that prisoner's vulnerability.

*Shirey v. Ladonne*, No. 18-4960, 2019 WL 1470863, at *18 (E.D. Pa. Apr. 3, 2019) (citing *Palakovic*, 854 F.3d at 223-24 (3d Cir. 2017)).

As applied here, Moving Defendants claim that they are not liable for Stacy's death because they were not her custodians at the time of her death. That is an unavailing challenge. The mere fact that an individual was not a prisoner's custodian at the exact time of their death is not a bar to a deliberate indifference to suicide claim. *See McCracken v. Fulton Cnty.*, No. 19-cv-1063, 2020 WL 8465441, at * 3-4 (M.D. Pa. Nov. 18, 2020) (report and recommendation adopted by 2021 WL 426461 (M.D. Pa. Feb. 8, 2021)) (deliberate indifference claim is viable against a sheriff transporting an arrestee known to have suicide risks); *Conn v. City of Reno*, 572 F.3d 1047, 1062 (9th Cir. 2009), *vacated*, 563 U.S. 915, *reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011) ("When a detainee attempts or threatens suicide

en route to jail, it is obvious that the transporting officers must report the incident to those who will next be responsible for her custody and safety.).[3] And that makes sense. Such a strict and narrow reading of a "custodian" would take away the teeth from many Eighth and Fourteenth Amendment deliberate indifference cases and would severely curtail such claims. For example, such an interpretation would permit a corrections officer "who failed to inform incoming officers of the inmate's suicidal statement had ended his shift and did not have custody of the inmate of the time of [his] suicide," to be free from liability. *McCracken v. Fulton Cnty.*, No. 19-cv-1063, 2020 U.S. Dist. LEXIS 197207, at *20 (M.D. Pa. Oct. 22, 2020) (citing *Owens v. City of Phila.*, 6 F. Supp. 2d 373, 376-77 (E.D. Pa. 1998)). However, the Eastern District of Pennsylvania rejected that very premise, and permitted claims against that defendant to proceed to trial. *Owens*, 6 F. Supp. 2d at 376-77.

---

[3] Moving Defendants contend that I should not rely on *McCracken* for the proposition that actual custody is not required for a deliberate indifference to suicide vulnerability claim. (Doc. 68, pp. 2-3). Moving Defendants argue that this case differs from *McCracken* because in that case, the transporting officer expressly informed prison officials that the decedent was not suicidal. *McCracken*, 2020 U.S. Dist. LEXIS 197207, at * 10. I fail to see how this fact implicates their theory that only the actual custodians at the time of an inmate's suicide can be liable for a deliberate indifference claim. Additionally, while the facts in *McCracken* might be more "egregious" because the transporting officer affirmatively told prison officials that the decedent was not suicidal, it does not mean Plaintiff has failed in this case to establish all the elements of a deliberate indifference claim. That will be discussed in detail in the next section of this opinion.

While I acknowledge Moving Defendants' argument that there is no precedential Third Circuit case on this issue, (Doc. 68, pp. 1-2), there is plenty of persuasive authority that paints a compelling argument for Plaintiff's claims against Officer Jungbaer at this stage of the litigation. Therefore, Moving Defendants' argument that they are not liable solely because they were not Stacy's custodian fails.

B.   THE CLAIMS AGAINST THE COLEDALE BOROUGH POLICE DEPARTMENT

Moving Defendants contend that the Coledale Borough Police Department is not an entity against whom suit can be brought. (Doc. 48, p. 7). Plaintiff concedes this point,[4] and affirmatively states that he does not oppose this aspect of Moving Defendants' Motion. (Doc. 63, p. 7 n.1). Therefore, the Coledale Borough Police Department will be dismissed from this action.

C.   THE CLAIMS AGAINST OFFICER JUNGBAER

Plaintiff brings both and official and individual capacity claims against Officer Jungbaer. Moving Defendants move to dismiss both claims. In this section, I'll discuss why the official capacity claims will be dismissed but the individual capacity claims will survive.

---

[4] The parties agree that "[i]n Section 1983 actions, police departments cannot be sued in conjunction with municipalities, because the police department is merely an administrative arm of the local municipality, and is not a separate judicial entity." *Padilla v. Twp. of Cherry Hill*, 110 F. App'x 272, 278 (3d Cir. 2004) (citing *DeBellis v. Kulp*, 166 F. Supp. 2d 255, 264 (E.D. Pa. 2001)).

1.    The Official Capacity Claims

Moving Defendants argue that the official capacity claim against Officer Jungbaer should be dismissed because it is wholly duplicative as his employer is a named defendant in this action. (Doc. 48, p. 7). Plaintiff counters that dismissal of the official capacity claim will "serve no laudable purpose," and counsels the Court to keep the claim. (Doc. 63, pp. 14-15). However, I agree with Moving Defendants on this point.

Official-capacity suits are "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. N.Y.C. Dept. of Social Servs.,* 436 U.S. 658, 690 n.55 (1978). In an official-capacity suit, the entity of which the officer is an agent is the real party in interest. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "There is no longer a need to bring official-capacity actions against local government officials, for under *Monell,* local government units can be sued directly for damages and injunctive or declaratory relief." *Id.* at 167 n.14. "[B]ecause official capacity claims against an individual defendant are duplicative of claims brought against a municipality, 'courts sitting in the Third Circuit have dismissed defendants sued in their official capacity when the same claims are made against the municipality.'" *Rankin v. Majikes*, No. 14-cv-699, 2014 WL 6893693, at *6 (M.D. Pa. Dec. 5, 2014) (quoting *Dubas v. Olyphant Police Dep't*, No. 11-cv-1402, 2012 WL 1378694, at *4 (M.D. Pa. Apr. 20, 2012)). This is by no means a requirement,

and district courts in this circuit have declined to dismiss official capacity claims if dismissal "will serve no laudable purpose." *Capresecco v. Jenkintown Borough*, 261 F. Supp. 2d 319, 322 (E.D. Pa. 2003).

I am persuaded by the Third Circuit's practice of routinely affirming district court decisions that dismiss official capacity claims as duplicative. While I acknowledge Plaintiff's argument and reliance on *Capresecco*, I believe dismissing official capacity claims serves a laudable purpose. In this case, with its numerous claims and defendants, it will streamline the case, keep a hypothetical jury focused on the salient issues, and declutter the docket. *See M.S. v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412, 419 (M.D. Pa. 2014) ("Moreover, considering the large number of Counts and Defendants named in the complaint, the Court is persuaded that retention of redundant official capacity claims would cause confusion and would unnecessarily clutter the docket."). So, the official capacity claim against Officer Jungbaer will be dismissed.

2.    The Personal Capacity Claims

Plaintiff has lodged two distinct, but similar claims against Officer Jungbaer: a Fourteenth Amendment deliberate indifference claim to Stacy's known risk of suicide and a Fourteenth Amendment deliberate indifference claim to Stacy's need of medical care. (Doc. 21, ¶¶89-98). While these claims are quite similar, I will discuss them separately to avoid confusing the issues.

a.   Deliberate Indifference to Suicide Risk

As stated *infra*, a deliberate indifference to one's suicide risk is a subtype of a deliberate indifference claim. To plead a claim under this framework, a plaintiff must allege: "(1) the prisoner had a particular vulnerability to suicide, (2) the prison official knew of that vulnerability, and (3) the prison official acted with deliberate indifference to that prisoner's vulnerability." *Shirey v. Ladonne*, No. 18-4960, 2019 WL 1470863, at *18 (E.D. Pa. Apr. 3, 2019) (citing *Palakovic*, 854 F.3d at 223-24 (3d Cir. 2017)).

As to the first factor, Moving Defendants argue that "Plaintiff's allegations fail to support Decedent's vulnerability to suicide . . . ." (Doc. 48, pp. 10-11). Plaintiff argues that he pleaded sufficient facts to support this, including the allegation that Sean and Alexander told Officer Jungbaer about Stacy's mental health conditions, her past suicide attempts, her altered mental status, and that Stacy was acting erratically and non-compliantly. (Doc. 63, pp. 16-17). Here, I agree with Plaintiff; he has pleaded enough facts as to Stacy's particular vulnerability to suicide.

"A particular vulnerability to suicide represents a serious medical need. The requirement of a particular vulnerability to suicide speaks to the degree of risk inherent in the detainee's condition. There must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) (internal citations and quotation marks omitted).

However, this standard was "was never intended to demand a heightened showing at the pleading stage by demonstrating . . . that the plaintiff's suicide was temporally imminent or somehow clinically inevitable. A particular individual's vulnerability to suicide must be assessed based on the totality of the facts presented." *Palakovic v. Wetzel*, 854 F.3d 209, 230 (3d Cir. 2017).

Here, Plaintiff established that Stacy had a particular vulnerability to suicide. Sean states that Stacy suffered from multiple mental illnesses, suicidal tendencies, psychotic episodes, and had a history of past suicide attempts and past psychiatric hospitalizations. (Doc. 21, ¶ 50). Additionally, Stacy was undergoing domestic strife that led to her arrest. (*Id.* at ¶ 45). The cumulative circumstances of these facts satisfy Plaintiff's pleading burden and other judges in this district have denied arguments to the contrary. *See, e.g.*, *Nealman v. Laughlin*, No. 15-cv-1579, 2016 U.S. Dist. LEXIS 116881, at *23 (M.D. Pa. Aug. 31, 2016) (finding that the cumulative nature of the plaintiff's mental health history, martial discord, prior suicide attempts, and delusional behavior satisfied the particular vulnerability to suicide pleading burden).

Next, Plaintiff must further allege that Officer Jungbaer knew or should have known of Stacy's particular vulnerability to suicide. Moving Defendants argue that the Amended Complaint contains no facts that "establish that Office Jungbaer was subjectively aware of any risk pertaining to Decedents alleged serious medical need." (Doc. 48, p. 9). They continue, arguing that Officer Jungbaer, as a layperson,

was "not charged with the duty of assessing" Stacy's medical needs, and that upon booking to the Prison, medical professionals properly assessed her needs. (*Id.* at pp. 9-10).

Plaintiff counters that Moving Defendants applied the wrong standard, and that a subjective appreciation of the risk is not required. Rather, "it is sufficient to allege that Officer Jungbaer was aware of facts from which he should have reasonably inferred such vulnerability." (Doc. 63, pp. 17-18). And, because Plaintiff pleaded that Officer Jungbaer had actual knowledge of Stacy's mental health history and suicide attempts/tendencies, Officer Jungbaer knew of Stacy's vulnerability. (*Id.*). I agree with Plaintiff.

Here, Sean and Alexander told Officer Jungbaer that Stacy had mental illnesses, suicidal tendencies, and a history of suicide attempts. (Doc. 21, ¶ 50). When an official has "actual knowledge of a history of suicide attempts or a diagnosis identifying suicidal propensities," they "know" of a particular vulnerability to suicide. *Palakovic*, 854 F.3d at 230-31. Thus, the second element is met.

Finally, I must analyze the third element: whether Officer Jungbaer displayed a deliberate indifference to this risk. Plaintiff correctly notes that this is not a subjective test, rather, deliberate indifference "only demands something more culpable on the part of the officials than a negligent failure to recognize the high risk

of suicide." *Palakovic*, 854 F.3d at 231 (internal citations and quotation marks omitted). At this stage, Plaintiff has plead enough to show that Officer Jungbaer displayed deliberate indifference to Stacy's claims. Plaintiff alleges that Officer Jungbaer was aware of Stacy's vulnerability to suicide and recklessly ignored that risk by failing to tell the Prison about that risk. (Doc. 21, ¶¶ 49-53). Thus, the deliberate indifference to suicide claim against Officer Jungbaer will survive.

        b.     Deliberate Indifference to Medical Care

The Eighth Amendment prohibits cruel and unusual punishment, and consistent with that demand, it requires prison officials to "provide human conditions of confinement, including adequate medical treatment." *Hankey v. Wexford Health Sources*, 383 F. App'x 165, 168 (3d Cir. 2010) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)). To establish a violation of a constitutional right to adequate medical care, an inmate must show (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d

64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

A deliberate indifference to medical care claim is near identical to a deliberate indifference to suicide risk claim. Therefore, for substantially the same reasons why the deliberate indifference to suicide risk claim will survive, the deliberate indifference to medical care claim will survive. Plaintiff alleged that Stacy had a particular vulnerability to suicide and therefore, had a serious medical need. Further, at this stage, Plaintiff has successfully plead that Officer Jungbaer displayed deliberate indifference to her serious medical need. Therefore, the deliberate indifference to medical care claim will survive.

D.   THE *MONELL* CLAIMS

Plaintiff alleges that Coaldale Borough[5] is responsible for constitutional violations because it failed to "create, establish, implement, and enforce policies, procedures, practices, and customs:" (1) to ensure the well-being of arrestees; (2) to ensure the well-being of arrestees after they leave police custody; (3) to ensure they can timely and accurately identify arrestees with mental illness and suicide risk; (4) to ensure police can safely manage and transport arrestees with mental illness and with a risk of suicide; (5) to ensure the Prison is aware of an arrestee's mental health

---

[5] Originally, Plaintiff brought *Monell* claims against Coaldale Borough and the Coledale Borough Police Department. However, in Section (IV)(B), I discussed why the Coledale Borough Police Department will be dismissed from this action.

and suicide risk; (6) to ensure police can recommend that an arrestee be placed on suicide watch at the Prison; and (7) to ensure police can transport arrestees to places other than the Prison that are better equipped to evaluate an arrestee's mental health. (Doc. 21, ¶ 107). In the alternative, Plaintiff pleads Coledale Borough failed to adequate train their police officers on all of the aforementioned policies. (*Id.*).

Moving Defendants argue that because the constitutional claims against Officer Jungbaer fails, this *Monell* claim also fails. (Doc. 48, p. 11). In the alternative, Moving Defendants assert that Plaintiff's *Monell* claims are "nothing more than bald, conclusory language [and] Plaintiff does not assert any particular municipal policy that caused Decedent's death while in the custody of a third party." (*Id.* at p. 12). Additionally, Moving Defendants argue that Plaintiff's failure to train claim fails because Plaintiff has not plead the required causal connection between the training deficiency and harm, and does not plead a pattern of similar constitutional violations. (*Id.* at pp. 12-13). Plaintiff counters (1) the absence of policy is a valid *Monell* claim to which he has plead sufficient facts and (2) he is proceeding with single incident failure to train claim, and thus, does not need to plead a pattern of similar constitutional violations. (Doc. 63, pp. 24-27). I agree with Plaintiff, and in this section, I will broadly discuss the standards for analyzing a *Monell* claim and analyze Plaintiff's two theories of liability under *Monell*: absence of policy and failure to train.

A municipality, like Coledale Borough, cannot be held liable for the unconstitutional acts of its employees on a theory of *respondeat superior*. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). Rather, "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)) (emphasis in original). To state a claim against Coledale Borough, Plaintiff must allege that the violation of his rights was caused either by a policy or by a custom of the municipality. *Monell*, 436 U.S. at 694; *Berg v. Cnty. of Allegheny,* 219 F.3d 261, 275 (3d Cir. 2000).

Municipal policies include the decisions of a government's lawmakers and the acts of its policymaking officials as well as municipal customs, which are acts or practices that, even though not formally approved by an appropriate decision maker, are so persistent and widespread as to have the force of law. *Id.*; *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003). In other words, a municipality "'can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom.'" *Mulholland v Gov't Cnty. of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) (quoting *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir. 1996)).

A policy or custom can be shown in any of four ways:

(1) the existence of a formal policy, officially promulgated or adopted by a municipality; *Monell*, 436 U.S. at 690; or

(2) that an official or officials responsible for establishing final policy with respect to the subject matter in question took action or made a deliberate, specific decision that caused the alleged violation of plaintiff's constitutional rights, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986) (citation omitted); or

(3) the existence of an unlawful practice by subordinate officials so permanent and well settled as to constitute "custom or usage" and proof that this practice was so manifest or widespread as to imply the constructive acquiescence of policymaking officials, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127-30 (1989); or

(4) if liability is based on a claim of failure to train or supervise, that "the failure to train amounts to deliberate indifference to the rights of persons with whom . . . [municipal employees] came into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

*Nye v. Cumberland Cnty.*, No. 1:14-CV-713, 2016 WL 695109, at *4 (M.D. Pa. Feb. 19, 2016).

"To satisfy the pleading standard, [a plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was." *McTernan v. City of York,* 564 F.3d 636, 658 (3d Cir. 2009). Additionally, there must be a direct causal link between the policy or custom and the alleged constitutional violation. *City of Canton v. Harris,* 489 U.S. 378, 385 (1989).

1.     Absence of Policy

Plaintiff contends that the municipality lacks appropriate policies in how police officers handle arrestees with suicide risks. In *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003), the Third Circuit recognized that the absence of a policy can serve as the basis for a *Monell* claim. In *Natale*, a prison had

no policy or requirement "that a doctor see an inmate during the first 72 hours of incarceration and no one was charged with determining whether an inmate should be seen by a doctor earlier in the 72-hour period." *Id.* at 584-85. The court concluded that "the failure to establish such a policy is a 'particular[ly] glaring omission' in a program of medical care," and thus denied summary judgment on plaintiff's *Monell* claim. *Id.* (quoting *Bd. Of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410-11 (1997).

Here, Plaintiff adequality pled the lack of a policy and how that absence harmed him. Plaintiff pleads that the Borough does not have policies, *inter alia*, to identify arrestees who might be a suicide risk, (Doc. 21, ¶ 107) or for police officers to communicate those risks to prison officials. (*Id.*). And Plaintiff contends that the absence of these policies is the direct proximate cause of Stacy's death. (*Id.* at ¶ 112). Thus, the absence of policy *Monell* claim will survive.

2.    Failure to Train

Plaintiff also contends that the municipality failed to train its employees. "Where the 'policy concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to deliberate indifference to the rights of persons with whom those employees will come into contact.'" *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)). "Additionally, 'the identified deficiency in a city's training program must be closely related to the

ultimate injury;' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation." *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)).

Generally, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citing *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). However, in some instances, a "single-incident liability" can be enough. *Id.* at 63. Single incident liability contemplates that, "in certain situations, the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights even without a pattern of constitutional violations." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (citing *Canton*, 489 U.S. at 390 n.10) (internal quotations omitted). An example of this theory comes from *Canton*, where the Supreme Court posed a hypothetical where:

> city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see *Tennessee v. Garner*, 471 U.S. 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

> *Canton*, 489 U.S. at 390 n.10.

Conversely, the Supreme Court held in *Connick v. Thompson*, 563 U.S. 51, 71-72 (2011) that single incident liability cannot be used to hold the New Orleans District Attorney liable for failing to train prosecutors on their discovery obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). The Court reasoned that there was no obvious need for specific legal training as prosecutors are trained legal professionals who endured rigorous schooling and training to reach their positions. *Id.* at 64-66. "Unlike armed police officers who must sometimes make split-second decisions with life-or-death consequences and have no reason to be 'familiar with the constitutional constraints on the use of deadly force, [p]rosecutors are not only equipped but are also ethically bound to know what *Brady* entails and to perform legal research when they are uncertain." *Thomas*, 749 F.3d at 224 (quoting *Connick*, 563 U.S. at 61-63) (internal citations and quotations omitted). Thus, the Court held that in light of prosecutors' "legal training and professional responsibility, recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." *Connick*, 561 U.S. at 66.

Thus, the question to resolve is whether this case falls closer to the *Canton* hypothetical, or to the facts of *Connick*. *Ponzini v. Monroe Cnty.*, No. 3:11-cv-00413, 2015 U.S. Dist. LEXIS 115669, at *44 (M.D. Pa. Aug. 31, 2015). I believe

it falls closer to *Canton*, and that single incident failure to train liability is appropriately pled in this case.

Here, Plaintiff pled that the Borough was responsible for the health and wellbeing of arrestees placed under their custody, (Doc. 21, ¶ 100-101), responsible for training police officers towards that goal, (*Id.* at ¶ 102), but didn't train their officers, (*Id.* at ¶ 106), knew or should have known it would lead to harm (*Id.* at ¶ 105-06), and thus, Stacy's death was "a highly predictable, and even expected, consequence." (*Id.* at ¶ 111). This is sufficient for Plaintiff's claim to continue. Further, I believe this case falls closer to the *Canton* hypothetical then the facts in *Connick*. The recipients of the training in this case would be police officers, not highly trained prosecutors. Additionally, there is an obvious consequence of failing to provide police training on handling individuals with a suicide risk. Thus, Plaintiff has pled sufficient claims under *Monell* without a pattern of similar violations.

E.   THE WRONGFUL DEATH AND SURVIVAL ACTION CLAIMS

Moving Defendants argue that Plaintiff's wrongful death claim (42 Pa. C.S. § 8301) and survival action claim (42 Pa. C.S. § 8302) fail because they "are not substantive causes of action, but rather, merely provide a vehicle to assert a claim for damages under a substantive cause of action." (Doc. 48, pp. 13-14). Plaintiff concedes that those two statutes did not create a new cause of action, but argues that

his claims should proceed, as other federal courts in the Commonwealth have allowed those claims to proceed. (Doc. 63, pp. 29-30).

The Pennsylvania Wrongful Death and Survival Act "did not create a new theory of liability but merely allow[s] a tort claim of the decedent to be prosecuted." *Ferencz v. Medlock*, 905 F. Supp. 2d 656, 674 n.10 (W.D. Pa. 2012). So, if "no underlying tort has been pled, there can be no wrongful-death or survival action." *McCracken v. Fulton Cnty.*, No. 19-cv-1063, 2020 WL 2767577, at * 27 (M.D. Pa. May 28, 2020). Therefore, if a plaintiff has plead successful Section 1983 claims, then their wrongful death and survival action claims should be allowed to proceed. *See, e.g., Summers v. City of Phila.*, No. 17-191, 2017 WL 2734277 at * 28-29 (E.D. Pa. June 26, 2017) ("While the Defendants are correct that [wrongful death and survival action] claims are not freestanding causes of action and must instead be predicated on an underlying claim, several courts in this circuit have permitted such claims to proceed to discovery when based on a § 1983 claim."); *Beaty v. Delaware Cnty.*, No. 21-cv-1617, 2021 WL 4026373, at * 3 (E.D. Pa. Aug. 5, 2021); *Maldet v. Johnstown Police Dep't*, No. 19-cv-325, 2019 WL 2435869, at *7 n.7 (W.D. Pa. June 11, 2019). Additionally, the Pennsylvania Political Subdivisions Tort Claims Act ("PSTCA"), codified at 42 Pa. C.S.A. § 8541, does not shield defendants from Section 1983 wrongful death and survival actions. *DeJesus v. City of Lancaster*, No. 14-cv-3437, 2015 WL 1230319, at *6-7 (E.D. Pa. Mar. 16, 2015) (allowing survival

action and wrongful death suit to continue despite defendants raising PSTCA defense); *Maladet*, 2019 WL 2435869, at * 14-15 (rejecting PSTCA defense in "§ 1983 claims brought through Pennsylvania's wrongful death and survival statutes" because the PSTCA has "no force when applied to suits under the Civil Rights Act."). And because Plaintiff has successful pled a Section 1983 claim, Plaintiff's survival action and wrongful death claims will continue.

F.    OFFICER JUNGBAER'S INVOCATION OF QUALIFIED IMMUNITY

Officer Jungbaer asserts he is protected by qualified immunity, and contends that there is no clearly established right that a police officer is responsible for a suicide while in the custody of a third party. (Doc. 48, pp. 14-15). Plaintiff counters that qualified immunity is a fact-specific inquiry and it should not be resolved at the motion to dismiss stage. (Doc. 63, p. 21). Additionally, Plaintiff argues that the failure to communicate to prison staff Stacy's vulnerability to suicide is deliberate indifference and violates a clearly established right. (*Id.* at pp. 21-22). I agree and decline to invoke qualified immunity at this time.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). A qualified immunity analysis involves two questions: whether the official violated a statutory or constitutional right, and whether that right was clearly

established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Lower courts have the discretion to decide which question to analyze first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

An official's conduct violates clearly established law when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.' " *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Supreme Court has stated that this standard does not require a case directly on point but requires that "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Taylor v. Barkes*, 575 U.S. 822 (2015).

The dispositive question that the court must ask is "whether the violative nature of particular conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at 742). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*; *see also Davenport v. Borough of Homestead*, 870 F.3d 273, 281 (3d Cir. 2017). This "clearly established" standard ensures that an official can reasonably anticipate when his or her conduct may give rise to liability, and "protects the balance between vindication

of constitutional rights and government officials' effective performance of their duties." *Reichle*, 566 U.S. at 664. Finally, "[w]ithin the Third Circuit, decisions from other circuits are pertinent in resolving issues of qualified immunity." *Kelly v. Jones*, 148 F. Supp. 3d 395, 410 (E.D. Pa. 2015) (citing *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004)).

As applied here, there is no question that a pretrial detainee can assert "a Fourteenth Amendment claim against custodial officers for deliberate indifference to his risk of suicide while in their custody." *McCracken v. Fulton Cnty.*, No. 19-cv-1063, 2020 U.S. Dist. LEXIS 197207, at * 18-19 (M.D. Pa. Oct. 22, 2020) (report and recommendation adopted without objection by 2020 U.S. Dist. LEXIS 249796 (M.D. Pa. Nov. 18, 2020)). Additionally, it is a clearly established that a custodial officer, including a transporting officer, "who knew or should have known of a detainee's particular vulnerability to suicide, and who acted with reckless or deliberate indifference to that vulnerability, could be liable" *Id.* (denying qualified immunity to a transporting officer who knew, but failed to communicate, an arrestee's particular vulnerability to suicide to prison officials). And indeed, as early as 1998, district courts in this circuit recognized such a clearly established right, without regard of limiting liability to officers who had actual custody of the inmate at the time of the suicide. *Owens v. City of Phila.*, 6 F. Supp. 2d 373, 376-77 (E.D. Pa. 1998). Additionally, case law from other circuits confirm that this is a clearly

Page 28 of 31

established right, and any officer in the custodial chain can be held liable for being deliberately indifferent to inmate's vulnerability to suicide. *Conn v. City of Reno*, 572 F.3d 1047, 1062 (9th Cir. 2010), *vacated*, 563 U.S. 915, *reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011) (denying qualified immunity to transporting officers who failed to report detainee's suicide risk to "those who will next be responsible for her custody and safety."). So, considering the case law, and the disfavored nature of ruling on qualified immunity issues at the pleading stage, I will deny Officer Jungbaer's invocation of qualified immunity at this time.

### G.  THE PUNITIVE DAMAGES CLAIM

Moving Defendants argue that municipalities are immune from punitive damages claims under Section 1983. (Doc. 48, p. 16). Plaintiff does not oppose that argument.[6] (Doc. 63, pp. 38). Therefore, any punitive damages claim against Coaldale Borough will be dismissed.

Moving Defendants also argue that punitive damages claims against Officer Jungbaer should be dismissed. (Doc. 48, p. 16). They argue that the allegations against Officer Jungbaer do not rise to the punitive damages standard, which Moving Defendants contend is "motivated by evil motive or intent," or "involves reckless or callous indifference to the federally protected rights of others." (*Id.* (citing *Savarese*

---

[6] Plaintiff concedes that *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) and *Feingold v. Se. Pa. Transp. Auth.*, 488 A.2d 284 (Pa. 1985) prohibits punitive damage claims against municipalities. (Doc. 63, p. 38).

*v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989)). Plaintiff disagrees and argues that he has successfully plead that Officer Jungbaer knew of Stacy's particular vulnerability to suicide, but deliberately disregarded it. (Doc. 63, p. 31-32).

Here, I agree with Plaintiff. "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). "[D]eliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer v. Brennan*, 511 U.S. 825, 845 (1994). So considering that Plaintiff has provided enough facts to plausibly allege a deliberate indifference claim against Officer Jungbaer, he has also successfully plead a punitive damages claim. *Tatsch-Corbin v. Feathers*, 561 F. Supp. 2d 538, 545 (W.D. Pa. 2008) (keeping punitive damages claim when plaintiff pled a successful deliberate indifference to suicide claim). The punitive damages claim will survive.

## H.   AMENDMENT WOULD BE FUTILE

"[I]f a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008). Most of Plaintiff's claims will survive for the exception of claims that he affirmatively

waived (claims against the Coaldale Borough Police Department and the punitive damages claim against Coaldale Borough) or the claim that I dismissed (the official capacity claim against Officer Jungbaer). Amendment would be futile towards all of these claims, so it will be denied.

V.    CONCLUSION

Coaldale Defendants' Motion to Dismiss will be granted in part and denied in part. An appropriate Order will issue.

Date: August 31, 2022                    BY THE COURT

                                         *s/William I. Arbuckle*
                                         William I. Arbuckle
                                         U.S. Magistrate Judge