UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SEAN REDCLIFT, | ) | CIVIL ACTION NO. 4:21-CV-1866 |
| *Individually and as ADMINISTRATOR* | ) | |
| *of the Estate of Stacy Redclift,* | ) | |
| Plaintiff | ) | |
| v. | ) | (ARBUCKLE, M.J.) |
| | ) | |
| SCHUYLKILL COUNTY *,et. al.* | ) | |
| Defendants | ) | |

<u>MEMORANDUM OPINION</u>
*Schuylkill County Defendants' Motion to Dismiss (Doc. 69)*

## I.    INTRODUCTION

Tragically, Stacy Redclift took her own life when she was detained at the Schuykill County Prison. Her family now brings this civil rights action against a variety of actors, from the police officers who arrested her to prison guards, alleging they displayed deliberate indifference to her known risk of suicide. The prison guards, the Schuylkill County Prison Board, and Schuylkill County have now moved to dismiss the claims against them.  For the reasons that follow, I will grant the Motion in part and deny the Motion in part.

## II.    BACKGROUND AND PROCEDURAL HISTORY

This case began on November 2, 2021, when Sean Redclift ("Plaintiff" or Sean),[1] acting individually and as the administrator of Stacy Redclift's estate, filed

---

[1] At times, for simplicity, I will refer to members of the Redclift family by their first names, without intending any disrespect or undue familiarity.

a Complaint. (Doc. 1). On January 6, 2022, Plaintiff amended his complaint as of right, and that is now the operative pleading. (Doc. 21).

In the motion to dismiss stage, I must take all facts presented in the Amended Complaint as true. *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). In the early morning of January 6, 2020, Stacy Redclift was involved in a domestic dispute with her husband, Sean, and her son, Alexander. (Doc. 1, ¶ 45). Coledale Borough Police Officer Matthew Jungbaer and Coledale Borough Police Officers John Doe 1 and John Doe 2 arrived at her residence, and arrested Stacy "due to her allegedly erratic and non-compliant behavior." (*Id.* at ¶ 46). Stacy was later arraigned and released to her mother's house. (*Id.* at ¶ 47).

However, instead of staying at her mother's house, Stacy returned to her home, and engaged in erratic and non-compliant behavior. (*Id.* at ¶ 48). Officer Jungbaer, and the two John Doe police officers responded to the Redclift home and arrested Stacy. (*Id.* at ¶ 49). The officers brought Stacy to the Schuykill County Prison (the "Prison"). (*Id.*).  However, before she arrived, Sean and Alexander told the officers that Stacy "had a history of mental illness, psychotic episodes, suicide attempts/ tendencies, and psychiatric hospitalizations." (*Id.* at ¶ 50). Despite this knowledge, the officers did not communicate this information to anyone at the Prison, including its medical providers (*Id.* at ¶¶ 51-52).

On January 6, 2020, at 12:11 p.m., Stacy was booked and processed at the Prison. (*Id.* at ¶ 54). At 1:51 p.m., Nurse Hysock performed a medication verification for Stacy. Nurse Hysock ordered various medications for Stacy, but failed to order Stacy's Paxil, a psychotropic drug. (*Id.* at ¶ 56).

In the early morning of January 7, 2020, Nurse Hollywood conducted a mental health and suicide screening of Stacy. (*Id.* at ¶ 58). Stacy told Nurse Hollywood that (1) she suffered from post-traumatic stress disorder, depression and bipolar disorder type two, (2) had a history of suicide attempts, (3) had a lengthy history of inpatient psychiatric hospitalizations, (4) she was currently being cared for by a psychiatrist for her mental health disorders, (5) that she was on medications for her medical illnesses, and (6) that she felt like she needed to see a mental health provider at that time. (*Id.* at ¶ 62).

The screening indicated that Stacy needed "further psychiatric evaluation," but it was never performed. (*Id.* at ¶ 59). Further, Nurse Hollywood incorrectly conducted the screening because she failed to obtain information from the Coaldale Borough Police Officers, and failed to "accurately appreciate, report, or record the information given to her by Officer Jungbaer, John Doe Coledale Police Officer 1, John Doe Coaldale Police Officer 2, or Ms. Redclift." (*Id.* at ¶ 61). Nurse Hollywood "reviewed and verified" Stacy's screening and medication forms at 4:07am on January 7, 2020. (*Id.* at ¶ 63).

Sometime on January 7, 2020, someone discovered that Stacy did not have her Paxil, and Nurse Practitioner McGowan ordered it for her. (*Id.* at ¶¶ 64-65). Despite it being ordered, the order was never approved and Stacy did not receive any Paxil during her incarceration. (*Id.* at ¶ 65). However, Nurse Gross attempted to give Stacy her other medications, but she refused. (*Id.* at ¶ 69).

Additionally, at 10 a.m., on January 7, 2020, Lt. Line received a call from Stacy's son, informing the Lieutenant that Stacy was calling him and Sean. (*Id.* at ¶¶ 66-67).  The son informed Lt. Line that they did not appreciate these calls and told Lt. Lane that if Stacy did not stop calling, they would press harassment charges. (*Id.*). Lt. Lane told the son that Stacy would be advised to stop calling them. (*Id.*). Someone later informed Stacy of her family's wishes. (*Id.*).

In the late evening of January 7, 2020, Stacy's cellmate found her hanging by a noose. (*Id.* at ¶ 71). Stacy Redclift died the next day. (*Id.* at ¶ 74).

Because of these actions, Plaintiff pleads nine counts against the various defendants. As applied to this motion, Plaintiff brings a wrongful death claim and a survival act claim against Schuylkill County, Schuylkill County Prison Board, and

sixteen prison employees.[2] ("Moving Defendants").[3] Plaintiff also brings a 42 U.S.C. § 1983 Fourteenth Amendment deliberate indifference to medical care claim against the individual defendants (all Moving Defendants besides the Prison Board and the County). Finally, Plaintiff brings a distinct *Monell* claim for violations of the Fourteenth Amendment (deliberate indifference to medical needs) against Schuykill County and the Schuykill County Prison.

On March 14, 2022, Moving Defendants sought dismissal of the claims against them for failing to state to claim upon which relief can be granted. (Doc. 69). Their Brief in Support was filed the same day. (Doc. 70). Plaintiff filed a Brief in Opposition on April 7, 2022. (Doc. 87). Moving Defendants did not file a reply brief. Thus, this Motion is ripe for resolution.

III.   THE MOTION TO DISMISS STANDARD

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief

---

[2] CO Billie Jo Bender, CO Ryan Parker, Eugene Berdanier, Lt. Barron Line, CO Justine Garcia, CO Robert Selgrade, CO Brian Gotshall, Lt. Thomas Hoban, Jr., CO Kylee Rauenzahn, CO Rebecca Bergan, CO Kassandra Confer, CO Christopher Fertig, CO William Schweikert, CO Jeffrey Moyer, Lt. Gary Keppel, and Elaine Gilbert

[3] Moving Defendants moved to include CO Billie Jo Bender and CO Ryan Parker into their Motion to Dismiss and accompanying briefs. (Doc. 94). That Motion will be granted.

can be granted. Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss, the court "must accept all factual allegations in the complaint as true, construe the complaint in the light most favorable to the plaintiff, and ultimately determine whether Plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). In review of a motion to dismiss, a court must "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

In deciding whether a complaint fails to state a claim upon which relief can be granted, the court is required to accept as true all factual allegations in the complaint as well as all reasonable inferences that can be drawn from the complaint. *Jordan v. Fox Rothchild, O'Brien & Frankel, Inc.*, 20 F.3d 1250, 1261 (3d Cir. 1994). These allegations and inferences are to be construed in the light most favorable to the plaintiff. *Id.* The court, however, "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). Further, it is not proper to "assume that the [plaintiff] can prove facts that [he] has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

"A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. *Id.* To determine the sufficiency of a complaint under the pleading regime established by the Supreme Court, the court must engage in a three-step analysis:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where they are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Santiago v. Warminister Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 675, 679). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief" and instead must "'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

As the Court of Appeals has observed:

> The Supreme Court in *Twombly* set forth the "plausibility" standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint which pleads facts "merely consistent with" a defendant's liability, "stops short of the line

between possibility and plausibility of 'entitlement of relief.'" *Id.* (citing *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

*Burch v. Millberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011).

## IV. DISCUSSION

Moving Defendants argue:

1. that Plaintiff failed to plead that any of the prison employees were personally involved in a constitutional deprivation,

2. that non-medical prison employees cannot be responsible for inadequate medical treatment, that the "*Monell*-like" claims against the former Warden and a staff member are not cognizable,

3. that Plaintiff failed to properly plead a *Monell* claim, and

4. that the Pennsylvania Wrongful Death and Survival Act does not provide a cause of action.

I'll discuss each in turn.

### A. THE PERSONAL INVOLVEMENT OF THE PRISON GUARD DEFENDANTS

Moving Defendants argue that Plaintiff's Amended Complaint "is completely silent regarding the specific conduct or personal involvement of any County Defendant." (Doc. 70, p. 15). Plaintiff counters that he "alleged that all of the moving Defendants had knowledge of numerous facts indicating that Mrs. Redclift was at increased risk of, and was particularly vulnerable to, suicide." (Doc. 87, p. 9). I agree with Plaintiff, he has alleged enough against the Moving Defendants at this stage.

To state a § 1983 claim, a Plaintiff must allege that each defendant had "personal involvement in the alleged wrongdoing." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)); *Clemens v. Warden SCI Greene*, 290 F. Supp. 3d 388, 395 (E.D. Pa. 2018). This includes "describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Clemens*, 290 F. Supp. 3d at 395. Simply put, "[l]iability under § 1983 is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice." *Quarles v. Palakovich*, 736 F. Supp. 2d 941, 949 (M.D. Pa. 2010).

Here, Plaintiff alleges that:

> Lt. Line; CO Garcia; CO Selgrade; CO Gotshall; Lt. Hoban; CO Rauenzahn; CO Bergan; CO Confer; CO Fertig; CO Bender; CO Moyer; CO Parker; Lt. Keppel; CO Schweikert, and Ms. Gilbert, all of whom knew or had reason to know that Mrs. Redclift: (i) would likely suffer negative psychological and emotional effects due to the mere fact of her incarceration and confinement in prison; (ii) had a history of mental illness; (iii) presently suffered from mental health issues; (iv) was being prescribed medication for mental illness; (v) had been admitted to psychiatric institutions in the past; (vi) had a history of suicide attempts; (vii) had screened as warranting further mental health/suicide evaluation in the Schuylkill County Prison; (viii) had felt she needed to be seen by a mental health professional in the Schuylkill County Prison; (ix) had had a significant change in circumstance since her incarceration, i.e., her family support system was withdrawn; (x) she was not administered prescribed medication; and (xi) had refused to take medication that was administered to her. As a result thereof, these Defendants knew or should have known that Mrs. Redclift was particularly vulnerable to suicide and that there was a strong likelihood

that she would attempt suicide. Nonetheless, these Defendants failed to take any action to provide Mrs. Redclift with adequate care, supervision, medication and/or treatment, or to guard against or prevent her from committing suicide.

(Doc. 21, ¶ 76).

Plaintiff repeats these allegations later in his Amended Complaint (*Id.* at ¶ 170). The Court finds that Plaintiff has pleaded sufficient facts against the prison officials at this stage, and that the officials have fair notice of the claims Plaintiff is making against them. Once discovery begins, then the Court and the parties will have a better grasp on what these individual defendants knew about Stacy and her condition. But until then, and assuming Plaintiff's allegations are true, the claims against Moving Defendants must survive. *See Ponzini v. Monroe Cnty.*, 897 F. Supp. 2d 282, 298 (M.D. Pa. 2012) ("At this preliminary stage, it would be inappropriate for the Court to make any findings of fact or to cast doubt upon any allegations as set forth in Plaintiffs' Amended Complaint.").

B.  WHETHER THE MOVING DEFENDANTS SHOULD BE DISMISSED BECAUSE THEY ARE NOT MEDICAL PROVIDERS

Moving Defendants, in the alternative to the personal involvement argument, contend that they cannot be held liable because "non-medical provider defendants cannot be deliberately indifferent to an inmate's medical condition if the inmate was receiving treatment from the facility's medical providers." (Doc. 70, p. 15). Plaintiff counters that Stacy didn't even receive medical treatment, and regardless, Moving

Defendants cite to misinterpreted and distinguishable case law. (Doc. 87, p. 13-17).

I agree with Plaintiff.

In *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993), the Third Circuit affirmed summary judgment for two non-medical prison defendants because:

> The only allegation against either of these two defendants was that they failed to respond to letters Durmer sent to them explaining his predicament. Neither of these defendants, however, is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.

The Court in *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) later clarified *Durmer*, noting that it's holding can be applied to the motion to dismiss stage, and that:

> If a prisoner is under the care of medical experts (Dr. McGlaughlin and Brown in this case), a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.
>
> Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official like Gooler will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Thus, as noted by Plaintiff, the question here is whether Stacy was being treated by medical professionals during her stay at the Prison. Based on a favorable reading of the Complaint, the answer is no. Plaintiff's "medical care" at the Prison consisted of "influenza, suicide, mental health, drug use and medication verification screenings," (Doc. 21, ¶ 55), prescription orders for Stacy for drugs that were prescribed to her by an out of prison provider prior to her incarceration, (*Id.* at ¶ 56), a second mental health and suicide screening which flagged her for further psychiatric evaluation, (*Id.* at ¶ 59), a review and verification of Stacy's screening and medication verification forms (*Id.* at ¶ 63), and an attempted administration of medications. (*Id.* at ¶ 69). At this stage of litigation, I am satisfied that this contact with medical professionals was not the kind of treatment contemplated by case law. Stacy's contact with medical providers largely consisted of health screenings, which appear to be routine for new inmates. Indeed, Stacy was flagged for further psychiatric treatment from a screening, but it was never provided to her. (Doc. 21, ¶ 59). Additionally, the medications that were ordered for her were prescribed by out of prison providers and Stacy was taking these medications before her incarceration. Therefore, I reject Moving Defendant's argument.

Finally, Moving Defendants ask me to rely on three cases that support their proposition that any treatment from a medical professional bars claims against non-medical prison officials: *Mitchell v. Sage*, No. 14-cv-905, 2014 U.S. Dist. LEXIS

155019 (M.D. Pa. July 21, 2014) report and recommendation adopted by 2014 WL 5493193 (M.D. Pa. Oct. 30, 2014); *Thomas v. Zinkel*, 155 F. Supp. 2d 408 (E.D. Pa. 2001); and *Newton v. Reitz*, No. 07-cv-1254, 2009 WL 233911 (M.D. Pa. Jan. 30, 2009). However, all are distinguishable, as these cases involve plaintiffs who had substantially more medical "treatment" than Stacy did.

In *Mitchell*, the plaintiff had multiple interactions with prison medical providers who were actively treating and diagnosing him with his ailments. *Mitchell*, 2014 U.S. Dist. LEXIS 155019, at * 9-12. In *Thomas*, the court dismissed the prison guards from a Eighth Amendment deliberate indifference to medical care claim when the plaintiff "received a variety of tests, prescriptions, and ongoing diagnoses from several different physicians . . . [but plaintiff] became increasingly unsatisfied with his doctors' refusal to order certain tests . . . ." *Thomas*, 155 F. Supp. 2d at 410. Finally, in *Newton*, the plaintiff admits he "regularly received medical attention" and was "prescribed medications during his incarcerations," but "did not believe his medical treatment was up to medical standards." *Newton*, 2009 WL 233911, at * 4-5. Thus, none of these cases are convincing to me, as these plaintiffs received substantially more care and interaction than Stacy did during her stay at the Prison.

C. WHETHER PLAINTIFF STATED A COGNIZABLE SECTION 1983 CLAIM AGAINST WARDEN BERDANIER AND ELAINE GILBERT

Plaintiff brings both and official and individual capacity claims against the former Warden of Schuykill County, Warden Berdanier, and the Director of Human

Services for Schuylkill County Prison, Elaine Gilbert.[4] Moving Defendants seek to dismiss both claims. In this section, I'll discuss why the official capacity claims will be dismissed but the individual capacity claims will survive.

### 1.   The Official Capacity Claims

Moving Defendants argue that the official capacity claims against Mr. Berdanier and Ms. Gilbert should be dismissed because it is wholly duplicative as their employer is named as a defendant in this action. (Doc. 70, p. 17). Plaintiff counters that dismissal of the official capacity claim will "serve no laudable purpose," and counsels the Court to keep the claim. (Doc. 87, pp. 21-22). However, I agree with Moving Defendants on this point.

Official-capacity suits are "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. N.Y.C. Dep't. of Social Servs.,* 436 U.S. 658, 690, n. 55 (1978). In an official-capacity suit, the entity of which the officer is an agent is the real party in interest. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "There is no longer a need to bring official-capacity actions against local government officials, for under *Monell,* local government units can be sued directly

---

[4] Based on the Amended Complaint, Ms. Gilbert was "was responsible for the overall administration and provision of comprehensive medical services, including mental health services, to inmates incarcerated within the Schuylkill County Prison. Ms. Gilbert was also responsible for staffing and training of prison nursing and medical personnel, formulating and enforcing policy/procedures regarding medical issues and performing daily inmate evaluations among other duties." (Doc. 21, ¶ 41).

for damages and injunctive or declaratory relief." *Id.* at 167 n.14. "[B]ecause official capacity claims against an individual defendant are duplicative of claims brought against a municipality, 'courts sitting in the Third Circuit have dismissed defendants sued in their official capacity when the same claims are made against the municipality.'" *Rankin v. Majikes*, No. 14-cv-699, 2014 WL 6893693, at *6 (M.D. Pa. Dec. 5, 2014) (quoting *Dubas v. Olyphant Police Dep't*, No. 11-cv-1402, 2012 WL 1378694, at *4 (M.D. Pa. Apr. 20, 2012)). This is by no means a requirement, and district courts in this circuit have declined to dismiss official capacity claims if dismissal "will serve no laudable purpose." *Capresecco v. Jenkintown Borough*, 261 F. Supp. 2d 319, 322 (E.D. Pa. 2003).

I am persuaded by the Third Circuit's practice of routinely affirming district court decisions that dismiss official capacity claims as duplicative. While I acknowledge Plaintiff's argument and reliance on *Capresecco*, I believe dismissing official capacity claims serves a laudable purpose. In this case, with its numerous claims and defendants, it will streamline case, keep a hypothetical jury focused on the salient issues, and declutter the docket. *See M.S. v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412, 419 (M.D. Pa. 2014) ("Moreover, considering the large number of Counts and Defendants named in the complaint, the Court is persuaded that retention of redundant official capacity claims would cause confusion and would unnecessarily clutter the docket."). So, the official capacity claims will be dismissed.

2.      The Individual Capacity Claims

In his Amended Complaint, Plaintiff accuses Warden Berdanier and Ms. Gilbert of failing to train or failing to implement appropriate policies in twenty-two different areas. Moving Defendants argue that these "*Monell* style claims" are duplicative of the claims made against their employer and that *Monell* claims can only be asserted against a municipal entity.[5] (Doc. 70, p. 17). However, Plaintiff is asserting supervisory liability claims against Warden Berdanier and Ms. Gilbert.[6] (Doc. 87, pp. 18-19); (Doc. 21, ¶ 161). Thus, Moving Defendants have not adequately briefed why the supervisory liability claims should be dismissed at this stage. The supervisory liability claims will be permitted to continue to discovery.

---

[5] If these are true *Monell* claims, then yes, these claims should be dismissed because *Monell* only applies to municipalities, not individuals. *Lepre v. Lukus*, 602 F. App'x 864, 869 n.4 (3d Cir. 2015); *see also Oren v. Pa. Dep't of Corrections*, 2022 WL 710188, at *3 n.5 (M.D. Pa. Mar. 9, 2022) (dismissing *Monell* claims asserted against individual defendants for failure to state a claim); *Moore v. Solanco Sch. Dist.*, 471 F.Supp.3d 640 (E.D. Pa. 2020) ("*Monell* liability applies only to municipalities, not to individuals"). However, these are supervisory liability claims.

[6] "A supervisor may be directly liable under the deliberate indifference test set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994), if the supervisor knew or was aware of and disregarded an excessive risk to the plaintiff's health or safety. A plaintiff can show this by establishing that the risk was obvious." *Palakovic v. Wetzel*, 854 F.3d 209, 225 n.17 (3d Cir. 2017) (cleaned up). *See Palakovic v. Wetzel*, 854 F.3d 209, 225 n.17 (3d Cir. 2017) (reversing dismissal of supervisory individual capacity defendants for adopting policies that they knew would cause harm).

D.   WHETHER PLAINTIFF STATED COGNIZABLE *MONELL* CLAIMS AGAINST
THE COUNTY AND THE PRISON BOARD

In Count VI of his Complaint, Plaintiff asserts, *inter alia*, that the County and the Prison Board failed to create appropriate policies to ensure the health of the inmates and that it failed to train its employees on how to appropriately evaluate and assess an inmate's mental status and suicide risk. (Doc. 21, ¶¶ 182-83). Moving Defendants assert that Plaintiff has alleged "a vague laundry list of supposed failures in the establishment and enforcement of policies related to the prevention in inmate suicide . . . [that] are unsupported by any factual predicate, and therefore fall woefully short of the specificity requirement to state a *Monell* policy claim." (Doc. 70, p. 19). Plaintiff counters that he adequately pled sufficient facts to support his claims. (Doc. 87, pp. 23-27). I agree with Plaintiff, and before I discuss why, I will discuss the pleading standards for *Monell* claims generally.

A municipality, like the County and the Prison Board, cannot be held liable for the unconstitutional acts of its employees on a theory of *respondeat superior*. *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978). Rather, "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original). To state a claim against the County or the Prison Board, Plaintiff must allege that the violation of his rights was caused either

by a policy or by a custom of the municipality. *Monell*, 436 U.S. at 694; *Berg v. Cnty. of Allegheny,* 219 F.3d 261, 275 (3d Cir. 2000).

Municipal policies include the decisions of a government's lawmakers and the acts of its policymaking officials as well as municipal customs, which are acts or practices that, even though not formally approved by an appropriate decision maker, are so persistent and widespread as to have the force of law. *Id.*; *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003). In other words, a municipality "'can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom.'" *Mulholland v Gov't Cnty. of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) (quoting *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir. 1996)).

A policy or custom can be shown in any of four ways:

(1) the existence of a formal policy, officially promulgated or adopted by a municipality; *Monell*, 436 U.S. at 690; or

(2) that an official or officials responsible for establishing final policy with respect to the subject matter in question took action or made a deliberate, specific decision that caused the alleged violation of plaintiff's constitutional rights, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986) (citation omitted); or

(3) the existence of an unlawful practice by subordinate officials so permanent and well settled as to constitute "custom or usage" and proof that this practice was so manifest or widespread as to imply the constructive acquiescence of policymaking officials, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127-30 (1989); or

(4) if liability is based on a claim of failure to train or supervise, that "the failure to train amounts to deliberate indifference to the rights of

persons with whom...[municipal employees] came into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

*Nye v. Cumberland Cnty.*, No. 14-cv-713, 2016 WL 695109, at *4 (M.D. Pa. Feb. 19, 2016).

"To satisfy the pleading standard, [a plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was." *McTernan v. City of York,* 564 F.3d 636, 658 (3d Cir. 2009). Additionally, there must be a direct causal link between the policy or custom and the alleged constitutional violation. *City of Canton v. Harris,* 489 U.S. 378, 385 (1989).

As to his absence of policy *Monell* claim, Plaintiff adequality pleaded the lack of relevant policies and how that absence harmed him. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (recognizing that the failure to promulgate policies can lead to *Monell* liability).[7] Plaintiff contends that the County and the Prison Board lack appropriate policies in a plethora of situations, including a policy: on training its staff to assess and identify inmates with mental illness and a suicide risk; ensuring that inmate's required medications are being administered, and "safely and appropriately treat[ing], manage[ing], and car[ing] for an inmate who manifests

---

[7] In *Natale*, a prison had no policy or requirement "that a doctor see an inmate during the first 72 hours of incarceration and no one was charged with determining whether an inmate should be seen by a doctor earlier in the 72-hour period." *Id.* at 584-85. The court concluded that "the failure to establish such a policy is a 'particular[ly] glaring omission' in a program of medical care," and thus denied summary judgment on plaintiff's *Monell* claim.

risk factors for self-harm and suicide;" and ensuring that inmates with suicide risks are not with tools they can use to kill themselves. (Doc. 21, ¶ 183). Plaintiff contends that the lack of appropriate policies "became so wide-spread and pervasive that it constituted a 'custom' that was accepted and condoned by [the Prison and the Prison Board]." (*Id.* at ¶ 186).

Here, Plaintiff adequality pleaded the lack relevant policies and how that absence harmed him. As stated above, Plaintiff pleads that the Prison and Prison Board do not have policies, on a host of relevant policies that could have prevented Stacy's death. And Plaintiff contends that the absence of these policies is the direct proximate cause of Stacy's death. (*Id.* at ¶ 191). Thus, the "absence of policy" *Monell* claim will survive.

Plaintiff also contends that the Prison and the Prison Board failed to train its employees in a variety of suicide related practices. (Doc. 21, ¶ 183). To succeed on a failure to train *Monell* claim, a plaintiff must "show[] that the failure amounts to deliberate indifference to the rights of persons with whom those employees will come into contact.'" *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)). "Additionally, 'the identified deficiency in a city's training program must be closely related to the ultimate injury;' or in other words, 'the deficiency in training [must have] actually

caused' the constitutional violation." *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)).

Here, Plaintiff has pleaded enough facts to support both of the requirements of a "failure to train: *Monell* claim. Plaintiff plead that the Prison and the Prison Board were responsible for the health and wellbeing of inmates at the Prison, (Doc. 21, ¶ 177), responsible for training its staff towards that goal, (*Id.* at ¶ 179), didn't train their staff in a variety of ways, (*Id.* at ¶ 183 ), knew or should have known it would lead to harm (*Id.* at ¶ 182), and thus, Stacy's death was "a highly predictable, and even expected, consequence." (*Id.* at ¶ 190). This is sufficient for Plaintiff's claim to continue at this stage.

E.    THE WRONGFUL DEATH AND SURVIVAL ACTION CLAIMS

Moving Defendants argue that Plaintiff's wrongful death claim (42 Pa. C.S. § 8301) and survival action claim (42 Pa. C.S. § 8302) fail because they "do not create independent causes of action; rather, they are derivative in the sense that the substance of the claims derives from the injury to the decedent." (Doc. 70, p. 18). Plaintiff concedes that those two statutes did not create a new cause of action, but argues that his claims should proceed, as other federal courts in the Commonwealth have allowed those claims to proceed. (Doc. 87, pp. 27-29).

The Pennsylvania Wrongful Death and Survival Act "did not create a new theory of liability but merely allow[s] a tort claim of the decedent to be prosecuted."

*Ferencz v. Medlock*, 905 F. Supp. 2d 656, 674 n.10 (W.D. Pa. 2012). So, if "no underlying tort has been pled, there can be no wrongful-death or survival action." *McCracken v. Fulton Cnty.*, No. 19-cv-1063, 2020 WL 2767577, at * 27 (M.D. Pa. May 28, 2020). Therefore, if a plaintiff has plead successful Section 1983 claims, then their wrongful death and survival action claims should be allowed to proceed. *See, e.g., Summers v. City of Phila.*, No. 17-191, 2017 WL 2734277, at * 28-29 (E.D. Pa. June 26, 2017); *Beaty v. Delaware Cnty.*, No. 21-cv-1617, 2021 WL 4026373, at * 3 (E.D. Pa. Aug. 5, 2021); *Maldet v. Johnstown Police Dep't*, No. 19-cv-325, 2019 WL 2435869, at *7 n.7 (W.D. Pa. June 11, 2019). Additionally, the Pennsylvania Political Subdivisions Tort Claims Act ("PSTCA"), codified at 42 Pa. C.S.A. § 8541, does not shield defendants from Section 1983 wrongful death and survival actions. *DeJesus v. City of Lancaster*, No. 14-cv-3437, 2015 WL 1230319, at *6-7 (E.D. Pa. Mar. 16, 2015) (allowing survival action and wrongful death suit to continue despite defendants raising PSTCA defense); *Maladet*, 2019 WL 2435869, at * 14-15 (rejecting PSTCA defense in "§ 1983 claims brought through Pennsylvania's wrongful death and survival statutes" because the PSTCA has "no force when applied to suits under the Civil Rights Act."). And because Plaintiff has successful plead a Section 1983 claim and plead a negligence claim not subject to this Motion, Plaintiff's survival action and wrongful death claims will continue.

F.    AMENDMENT WOULD BE FUTILE

"[I]f a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008). All of Plaintiff's claims against Moving Defendants will survive except for the official capacity claims against Warden Berdanier and Elaine Gilbert. Amendment would be futile towards these claims, so amendment will be denied.

V.    CONCLUSION

Schuykill County Defendants' Motion to Dismiss will be granted in part and denied in part. An appropriate Order will issue.

Date: August 31, 2022                           BY THE COURT

                                                *s/William I. Arbuckle*
                                                William I. Arbuckle
                                                U.S. Magistrate Judge